**UNITED STATES v. ANTHONY et al.**
Nos. 12069–12072.

District Court, S. D. California, Central
Division.

June 23, 1936.

554

Peirson M. Hall, U. S. Atty., by Howell Purdue, Deputy U. S. Atty., both of Los Angeles, Cal.

. Ames Peterson, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge (after stating the facts as above).

The practice has grown up, both in the state and federal courts, for judges, when determining criminal cases, without a jury, to state their reasons. Whether it is a good practice or not, I do not know. I have followed it at all times. And the facts in this case warrant a full statement of the grounds of the decision reached.

I realize that a case of this character is of great importance to the government and to the defendant. Ultimately, the Harrison Act is an important statute. It passed was in 1914 (38 Stat. 785). It has been before the courts on many occasions, and has been sustained. It has, in many instances, and in many respects,

been declared a great success. It has been followed, as a matter of fact, by statutes in various states, supplementing it so as to cover the situations which could not be handled under the act.

Every one is satisfied that the Harrison Act has been noteworthy in destroying or minimizing the nefarious traffic in narcotics. It has been very successful in reaching the peddler, who, for many years, has been the great source of illegitimate supply, to such an extent that whether administering state laws or the federal law, judges have drawn the line between the addict who may be found with illegally obtained drugs in his possession and the peddler who, for a consideration, supplies the need and barters upon what has been here declared to be a disease. And in dealing out punishment I think the courts, as a rule, have distinguished between the two conditions, treating one as a diseased and unfortunate person and the other as a mercenary trafficker in drugs.

I am making the remarks to indicate why I consider a prosecution under this act important from the standpoint of the government. Ultimately, of course, we have to administer the law as we find it. We go back to the old Latin phrase that the province of the court is *jus dicere* not *jus dare;* to *pronounce* the law, not to *make* or *give* the law.

The prosecution in this case is not the prosecution of a lay peddler. It is the prosecution of a physician for having trafficked in narcotics. A physician is within the exceptions to the prohibitions of the statute which is now codified as section 1044, title 26 U.S.C.A. The statute (section 1044 (a) itself provides: "It shall be unlawful for any person to sell, barter, exchange, or give away any of the drugs mentioned in section 1040 (a) except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Commissioner." Section 1040 (a), to which reference is made in the section quoted, provides: "There shall be levied, assessed, collected, and paid upon opium, coca leaves, any compound, salt, derivative, or preparation thereof, produced in or imported into the United States, and sold, or removed for consumption or sale, an internal revenue tax at the rate of 1 cent per ounce, and any fraction of an ounce in a package shall be taxed as an ounce."

The exception which is in paragraph (c) of section 1044, U.S.C.A., title 26, says: "Nothing contained in this chapter shall apply—(1) To the dispensing or distribution of any of the drugs mentioned in section 1040 (a) to a patient by a physician, dentist, or veterinary surgeon registered under section 1384 in the course of his professional practice only."

The statute has been sustained as a revenue statute. And in the various decisions to which reference has been made during the course of the discussion here, particularly in United States v. Doremus (1919) 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493, a majority of the court sustained the act upon the ground that it is not an invasion of the province of the state; that it is a revenue measure only; and that its moral ends are incidental only. Mr. Chief Justice White, Justices McKenna, Van Devanter, and McReynolds expressed the view, to which they later adhered, that the act was not a revenue act, was an invasion of the province of the states, and was, therefore, unconstitutional.

I am referring to these facts in order to indicate that we must bear in mind the purpose of the act—that the act is a borderline statute which must be interpreted in such a manner as to bring it within the constitutional power. And if we depart from it and interpret it either as attempting to regulate the disposition and sale of narcotics or attempting the regulation of medicine, we extend the act to the realm which the Supreme Court has repeatedly said the federal government cannot enter, under the penalty of unconstitutionality.

The Linder Case (Linder v. United States [1925] 268 U.S. 5, 45 S.Ct. 446, 449, 69 L.Ed. 819, 39 A.L.R. 229) is very important. We all seem to agree, whether we read it alike or not, that it determines this case, so far as the law is concerned. I wish to refer to it for the present only for the purpose of pointing out that the moment we assume that this act *regulates the sale* within the state of narcotics and that it aims *to regulate the practice of medicine,* we must hold it unconstitutional.

In the Linder Case, Mr. Justice McReynolds, speaking for the court, made this observation: "Obviously, direct control of medical practice in the states is beyond the power of the federal government. Incidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and

unnecessary to reasonable enforcement of a revenue measure. The enactment under consideration levies a tax, upheld by this court, upon every person who imports, manufactures, produces, compounds, sells, deals in, dispenses or gives away opium or coca leaves or derivatives therefrom, and may regulate medical practice in the states only so far as reasonably appropriate for or merely incidental to its enforcement. It says nothing of 'addicts' and does not undertake to prescribe methods for their medical treatment. They are diseased and proper subjects for such treatment, and we cannot possibly conclude that a physician acted improperly or unwisely or for other than medical purposes solely because he has dispensed to one of them in the ordinary course and in good faith, four small tablets of morphine or cocaine for relief of conditions incident to addiction. What constitutes bona fide medical practice must be determined upon consideration of evidence and attending circumstances. Mere pretense of such practice, of course, cannot legalize forbidden sales, or otherwise nullify valid provisions of the statute, or defeat such regulations as may be fairly appropriate to its enforcement within the proper limitations of a revenue measure." Linder. v. United States, supra, 268 U.S. at page 5, 45 S.Ct. 446, 449, 69 L.Ed. 819, 39 A.L.R. 229.

Further on in the opinion, referring to the Webb Case (Webb v. United States [1919] 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497), which Mr. Howell Purdue, the assistant United States attorney, has mentioned in his concluding remarks, the court limits the language of that decision which was first interpreted as meaning that *no* prescription to an addict could be justified under the act, and says: "The question specified no definite quantity of drugs, nor the time intended for their use. The narrated facts show, plainly enough, that physician and druggist conspired to sell large quantities of morphine to addicts under the guise of issuing and filling orders. The so-called prescriptions were issued without consideration of individual cases and for the quantities of the drugs which applicants desired for the continuation of customary use. The answer thus given must not be construed as forbidding every prescription for drugs, irrespective of quantity, when designed temporarily to alleviate an addict's pains, although it may have been issued in good faith and without design to defeat the revenues."

Further on in the opinion, talking about the Behrman Case, also referred to by Mr. Purdue (United States v. Behrman [1922] 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619), and interpreting some of the language contained in it, the court says:

"This opinion related to definitely alleged facts and must be so understood. The enormous quantity of drugs ordered, considered in connection with the recipient's character, without explanation, seemed enough to show prohibited sales and to exclude the idea of bona fide professional action in the ordinary course. The opinion cannot be accepted as authority for holding that a physician, who acts bona fide and according to fair medical standards, may never give an addict moderate amounts of drugs for self-administration in order to relieve conditions incident to addiction. Enforcement of the tax demands no such drastic rule, and if the Act had such scope it would certainly encounter grave constitutional difficulties.

"The Narcotic Law is essentially a revenue measure and its provisions must be reasonably applied with the primary view of enforcing the special tax."

In a subsequent case, Nigro v. United States (1928) 276 U.S. 332, at page 341, 48 S.Ct. 388, 390, 72 L.Ed. 600, Mr. Chief Justice Taft, writing the opinion for the court, in answering certain certified questions by the Eighth Circuit Court of Appeals came back to the subject of interpretation of the act, saying: "In interpreting the act, we must assume that it is a taxing measure, for otherwise it would be no law at all. If it is a mere act for the purpose of regulating and restraining the purchase of the opiate and other drugs, it is beyond the power of Congress, and must be regarded as invalid, just as the Child Labor Act of Congress was held to be, in Bailey, Collector, v. Drexel Furniture Company, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432."

So we have in these cases the two limitations which the court has placed upon the act—that it must not be interpreted as endeavoring to regulate the local sale of drugs, or as an attempt upon the part of the federal government to regulate the practice of medicine.

The Linder Case also lays down the rule which, to my mind, is very clear, and is made clearer by subsequent cases which have interpreted it, that the act does not attempt to tell how much a physician may

prescribe to an addict. We must bear in mind, in reading the Linder Case, that the court there was not passing upon a case after trial. The court was merely dealing with the sufficiency of an indictment which charged delivery of a prescription to a person, and did not even charge sale. So that what the court said about four grains or about a moderate amount must be interpreted in the light of that fact. In fact, its own language, in interpreting the Webb Case, intimates that it does not intend to delimit either the quantity or frequency with which a physician in his practice may prescribe. Such an attempt would make the court the arbiter of the practice of medicine. In Strader v. United States (C.C.A.10, 1934) 72 F.(2d) 589, 592, the court, in commenting upon a statement of the trial judge to the effect that the prescription to an addict is a violation of the law, and that the statute provided it may not be given merely for the purpose of relieving pain incident to addiction, said: "We think the court incorrectly stated the law and unduly circumscribed the testimony. The statute does not prescribe the diseases for which morphine may be supplied. Regulation 85 issued under its provisions forbids the giving of a prescription to an addict or habitual user of narcotics, not in the course of professional treatment, but for the purpose of providing him with a sufficient quantity to keep him comfortable by maintaining his customary use. Neither the statute nor the regulation precludes a physician from giving an addict a moderate amount of drugs in order to relieve a condition incident to addiction, if the physician acts in good faith and in accord with fair medical standards."

I do not think that the case of Du Vall v. United States (C.C.A.9, 1936) 82 F.(2d) 382, 384, contains anything which detracts from that interpretation of the law. The court there cited the Strader Case. It was not dealing with the sufficiency of the testimony. It dealt merely with the instructions given by the trial judge. This is the instruction which the court approved: "'If the prescriptions were issued in good faith and according to fair medical standards, in the curing of disease, and not merely to satisfy the cravings of the said persons for such drug, then they may be said to have been issued in the course of the defendant's professional practice only; but if the prescriptions were not issued in good faith, but were issued to enable such person to obtain morphine sulphate to satisfy his appetite and cravings for such drugs only, and not in the treatment of his patient, then the issuance of such prescriptions would not be in good faith nor in the course of the defendant's professional practice as a physician, and the sale and dispensing upon such prescriptions would not be lawful.'" The court then continued: "Furthermore, although the court in its charge quoted the departmental regulation authorizing the supplying of morphine to 'aged or infirm addict whose collapse would result from the withdrawal of the drug, provided he endorsed on the prescription that the patient is aged and infirm (giving age), or if he prefers he may endorse Exception 2, Article 85,' the jury was nevertheless instructed to acquit notwithstanding the fact that the addict in the case at bar was only thirty-one years of age, if the prescription was made in good faith and in the course of the professional practice of the physician."

In the other case to which reference has been made, Grigg v. Bolton (C.C.A.9, 1931) 53 F.(2d) 158, the opinion was written by our colleague Judge William P. James. There the question arose upon a writ of habeas corpus. It was a writ brought against the United States marshal for the district of Montana claiming that the petitioner was being restrained under an indictment which charged him with no offense. We know the limited inquiry in such cases. On the face of the indictment, Judge James, writing for the circuit, held that it stated an offense. He cited the Webb Case and he cited the Jin Fuey Moy Case, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214. He did not cite the Linder Case. I am satisfied that the decision was correct because the offense charged distinctly a sale and a conspiracy to violate the act by unlawfully selling, bartering, exchanging, and dispensing and possessing narcotic drugs, to wit, morphine sulphate, in violation of the law.

I am satisfied, therefore, that the Linder Case, and the cases which interpret it, lay down the rule definitely that the statute *does not say what drugs* a physician may prescribe to an addict. Nor does it say the *quantity* which a physician *may* or *may not* prescribe. Nor does it regulate the *frequency* of the prescriptions. Any attempt to so interpret the statute, by an administrative interpretation, whether that administrative interpretation be oral, in writing,

or by an officer or by a regulation of the department, would be not only contrary to the law, but would also make the law unconstitutional as being clearly a regulation of the practice of medicine.

■ The courts have wisely held, in determining what is or is not good professional practice, that it should be determined in the light of expert testimony, in the light of the particular need of the particular occasion. In the case which followed the Linder Case, Boyd v. United States (1926) 271 U.S. 104, 46 S.Ct. 442, 443, 70 L.Ed. 857, the court limited the Linder Case and criticized an instruction of the trial judge which would have limited the prescriptions to an addict to a single dose. The syllabus summarizes the decision correctly. It reads: "The mere fact that the quantity of morphine dispensed by a registered physician by a prescription to a morphine addict without a written order, exceeds what would be required by the patient for a single dose, does not constitute a violation of the Anti-Narcotic Act." The court stated that the instructions of the trial judge in that case contained language which went counter to the Linder Case, but that certain other instructions cured the error. The instructions were:

" 'I am requested to say to you, Gentlemen, that in determining whether or not the defendant in prescribing morphine to his patients was honestly seeking to cure them of the morphine habit, while applying his curative remedies, it is not necessary for the jury to believe that defendant's treatment would cure the morphine habit, but it is sufficient if defendant honestly believed his remedy was a cure for this disease.'

" 'I instruct you that, if this is true, regardless of whether the course of treatment given by this defendant is a cure, the question is: Was he honestly and in good faith in the course of his professional practice and in an effort to cure disease issuing these prescriptions?' "

The court commented: "With that addition the charge elicited no criticism or objection from the defendant, although there was full opportunity therefor. It evidently was regarded as consistent and satisfactory."

I have gone into this detailed discussion because counsel for the government, in the course of his argument, has stated it as his opinion that even if Dr. Anthony followed the school of thought which justified the prescription of narcotics under the circumstances and in the quantities prescribed, nevertheless the prescription of large amounts to addicts would amount to a violation of the law, irrespective of his beliefs.

■ I cannot so interpret the meaning of the law. If I did, it would make the question of good faith not one to be determined upon the basis of the evidence and expert testimony. We would have a situation where the courts would arbitrarily say that, irrespective of the belief of the physician that he is effecting a cure or properly prescribing narcotics, the amount is excessive and is *ipso facto* a violation of the law.

■ Nor do I find in these cases anything to justify counsel's statement that the dispensing by physicians must be limited to an immediate need and that a physician cannot give to a patient a large prescription for self-administration under certain circumstances—warranted either by impossibility of hospitalizing the patient, or other conditions or by the desire to continue him at his work.

Nor can I find in these cases aught which says that where the physician is satisfied, from the patient's history and his own cursory examination, or where that patient is suffering from narcotism or other pathological conditions that require to be relieved medically by drugs, that he cannot rely upon the judgment of a duly established clinic maintained for a time by the city of Los Angeles, but must, because the chief of police and the narcotic officers have so requested, re-examine each individual case under the penalty of being guilty of the violation of this act.

■ On the contrary, a study of these cases leads me to the conclusion that there is no dogmatic rule which the courts have laid down for the purpose of determining what is good or bad professional practice. That must be established by the same rule by which the courts determine whether malpractice exists in a certain case. In determining that fact the courts of California and the courts of practically every state of the United States have laid down the rule that a physician is not a guarantor of cure; that he is not even a guarantor of diagnosis; that he merely warrants by his employment that he will exercise ordinary care, the ordinary care

of the physicians in his locality or in similar localities. More, the law of California and other states is that what is good practice in a particular case is not to be determined by any abstract concept but by the opinion of experts whose testimony may be given in court.

In a leading case on the subject in California, Patterson v. Marcus (1928) 203 Cal. 550, at page 553, 265 P. 222, 223, the Supreme Court says: "It has been held in this state that the implied contract on the part of the physician is that he possesses that reasonable degree of learning and skill possessed by others of his profession, and that he will exercise reasonable and ordinary care and skill in the application of that learning to accomplish the purpose for which he is employed. * * * As to what is or is not the proper practice is uniformly a question for experts, and can be established only by their testimony."

Reference is there made also to Perkins v. Trueblood (1919) 180 Cal. 437, 181 P. 642, 644, where this is said: "In McGraw v. Kerr, 23 Colo.App. 163, 123 P. [870] 873, it is said: 'Negligence on the part of a physician consists in his doing something which he should not have done, or in omitting to do something which he should have done.' Quoting further from the same case: 'The authorities are practically uniform in holding * * * that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony.'"

So that, in final analysis, the court, in this case, is confronted with the duty of determining from the evidence whether there is evidence in the record showing beyond a reasonable doubt that the treatment given to these addicts was not proper professional treatment under the circumstances, or, to put it conversely, whether the evidence establishes the fact, or raises a reasonable doubt that it is proper medical treatment.

I think Judge James, who tried the case the first time, correctly stated the law on the subject when he instructed the jury:

"The law does not prohibit a physician from prescribing to an addict for self-administration, for the purpose of relieving conditions mental or physical which may be the product of addiction to the drug, or otherwise caused, such reasonable amounts, one dose or a number of doses of morphine, as fair medical standards recommend. In doing this the physician must act with the honest belief, based upon his medical knowledge, that the case reasonably requires such treatment. He is not to be held accountable for a mere error of judgment in such a case, or be held responsible to the law merely because results are not as favorable as he expected or anticipated. His responsibility is different, and he will be held accountable under the law, if he, not using his best medical judgment in determining that the patient is in need of the treatment, issues prescriptions at the request of an addict merely to furnish such a supply of the drug as the addict may desire, in return for compensation received, or even without compensation. The last situation would be one that may be defined as an unlawful furnishing of narcotics and would be within the prohibitions of the law we are here applying.

"In determining whether a physician has acted in good faith in prescribing morphine for a patient, you are to consider what the accepted opinion of the medical profession is upon that point—if reputable physicians honestly hold to two opinions, some justifying the administration of morphine in the manner and in the quantities shown to have been administered by Dr. Anthony to the subjects named in the indictment, and others are honestly opposed to such opinion, and if the defendant held honestly to the opinion shown to be that of one group of reputable medical practitioners, and in the best of good faith acted accordingly, he would not be guilty. You have that question to decide and you are required to make up your judgment on the evidence submitted to you. Good faith on the part of the accused is an all-important element in the offenses charged—good faith according to fair or reasonable medical standards as understood by him. If you have a reasonable doubt as to what fair medical practice would require in the cases treated by the defendant, but find that the defendant believed he was acting according to good medical standards, he would be entitled to an acquittal. The purpose of the law, in making the exception as to practicing and registering physicians, is to allow the medical profession the right to prescribe such narcotic drugs as the necessary needs of their patients in their honest judgment, require."

What the law punishes is *not bad judgment* in a physician, *but bad faith.*

And the bad faith must appear. I agree with counsel for the government that circumstances may arise where, from the unexplained number of prescriptions, the unlimited amount, the relationship of the parties, an inference of bad faith, might be drawn without any other evidence. But I do not think that the law compels such a conclusion as a finding—a dogmatic, irrevocable conclusion—to be drawn in all cases where the prescription is not ·limited to one dosage or several dosages. Where there is an explanation, the law relegates us to the position of having to determine, as the trier of facts, in the light of such testimony as has been presented by the experts in this case, and in the light of all the circumstances of the case and the testimony of the physician himself, whether or not there was good faith.

■ The statement just made is broader than necessary because the presumption of innocence avails the defendant. And if the evidence is such as to raise in the mind of the trier of facts a reasonable doubt as to whether the practice followed by the physician was proper or improper, the judge, as the trier of facts, must, as would a jury under his instructions, under the doctrine of reasonable doubt, resolve that doubt in favor of good faith and acquit the defendant.

Now, if we analyze the cases treated by the defendant which have been brought before the court, we divide them into two classes: Three cases which may be called "clinic cases," and the fourth a "nonclinic" case.

■ There is no need to go into a detailed discussion of the events which led first to the establishment and then the abandonment of the narcotic clinic in the city of Los Angeles. I am satisfied that everybody acted in good faith. These facts are undisputed: The authorities of the city of Los Angeles, at the behest of the Los Angeles Medical Society, confronted as is every large city with the narcotic problem—and particularly every large city which is within easy access of countries like Mexico, which are a great source of supply for drugs—were also confronted with the problem of a large number of addicts whose wants were being supplied by peddlers for remuneration. They approached the problem not dogmatically, but scientifically. And on the advice of medical authorities, the health authorities of the city of Los Angeles established a clinic wherein these known addicts whose addiction had become pathological could, after being examined by physicians and certified, receive a quantity of the drug. It is also undisputed that thereafter (on May 11, 1934) a meeting was called and attended by representatives of various departments of the state, local, and federal governments interested in the matter. The meeting was held in the office of the health officer of the city of Los Angeles, Dr. George Parrish—the same officer who had continued the clinic which his predecessor, Dr. Powers, had established previously at the behest of the physicians. He testified that one physician was designated by his office to prescribe. Afterwards the clinic was taken over by the County General Hospital. He asked the defendant to come to the meeting because of the experience the defendant has had with the disease as a federal physician appointed by the government to look after the health of the federal prisoners incarcerated in various jails. There is some disagreement as to what took place at the meeting. I think too much attention has been paid to the fact that Chief of Police James E. Davis of Los Angeles stated that under no circumstances could prescriptions continue without a reexamination, and to the fact that Mr. Harry E. Smith, the United States Narcotic Agent for this district, made a similar statement. Ultimately, neither Chief Davis nor the federal authorities can give an ultimatum to a physician as to the manner of treatment by him—as to a course of professional conduct—the violation of which would constitute a violation of the law.

The fact remains, however, that Dr. Parrish, the health officer of the city of Los Angeles, had asked Dr. Anthony to take over the prescribing for these addicts who had been certified by the clinic. Dr. Parrish testified that Dr. Anthony called him up, as the patients would be sent to him, told him that the police were giving him trouble, and that the Federal Narcotic Agents were creating difficulties, that he was "having too much grief and it was costing him too much in his medical practice" to continue this Good Samaritan act which he was doing at the request of his colleague. On one occasion he asked to be allowed to resign the position. The fact is also undisputed that during the seven weeks Dr. Anthony was actually paid by the city of Los Angeles the sum of $135 for taking over this clinic.

When we come to the men who were in the clinic—the three men—we find that each of them had been previously examined. Each of them had been certified by the public physicians as suffering from chronic addiction which required treatment. We find in addition to that, and despite the fact that the number of cases made it impossible to examine them all at one time, the defendant made examinations of each of them.

I think the testimony of the addicts themselves is sufficient to show the defendant's good faith even if no one else had so testified. In fact, I am inclined to think that without the expert testimony of Dr. Orbison and Dr. Thienes, as to those three cases, at least, the defendant would have been entitled to a verdict of acquittal at the conclusion of the government's testimony. But the fact that there was expert testimony to the effect that it was not proper medical practice, and there was no statement by the defendant except such as might be implied from the facts surrounding the prescriptions, that he acted in good faith, led me to deny the motion upon the ground that a prima facie case had been shown. Although I am inclined to the view that as to these three cases, even excluding the defendant's testimony and the testimony of the experts to the contrary, the court could have concluded from the fact that the defendant was asked to take over the work and from the fact that he made such examination as he could, that he acted in good faith under the circumstances.

Let us look at the testimony of these three persons. First comes Jensen. He testified that he had been an addict for twelve years and had suffered from phlebitis, from backaches, and had gone to Dr. Anthony. He described his pains to him and told him the nature of them and the names of the doctors to whom he had gone and who had given him narcotics. The defendant took both a urine test and a blood test. At first he did not give him any prescription. The next time he not only prescribed the drug but he put some medicine on his back. He gave him morphine after the laboratory tests of the urinalysis and the blood analysis came back. He advised confinement, claiming that his addiction could be cured if he could stay in bed and have himself examined and treated. He told him that Dr. Edward Huntington Williams had examined him in 1933 and had said that he had syphilis and that a Dr. Smith had prescribed narcotics.

We come to Peter Mayers. He had been an addict for thirty-five years, and he claims to have a broken back. There is no dispute that he has a broken back and that some vertebræ had been removed. He had been getting from four to seven grains a day and was sent from the General Hospital. The defendant gave him a thorough examination; he examined him with a stethoscope and saw he was wearing a brace; he wanted him to come back for further X-rays; and he gave him medicine for asthma. He testified that he had been examined by six physicians at the clinic before he was certified as an addict.

William Avery had been an addict for twenty-seven years. He had been examined at the clinic and headed the list of the names of the patients of the clinic that was given to the defendant. He made such examination as he could make, but could not make a more thorough examination.

As to all these patients we have the statement of the defendant that, in his opinion, the prescription was proper under the circumstances. There is the testimony of Dr. Orbison and Dr. Thienes that, in their opinion, the amount prescribed was not necessary. Opposing this we have the testimony of Dr. George Parrish, as well as that of Dr. Ross Moore, and Dr. William Duffield, that it was a proper medical practice. Dr. Duffield testified that in his opinion ambulatory treatments were not correct. But all these physicians and others testified that where drug addiction had become pathological (i. e., narcotism had become a disease), the withdrawal of narcotics was not justifiable.

When we come to the Joseph Tint case, we find that he was a "private" (i. e., a nonclinic) patient. Tint had taken the drug for twenty-three years, and suffered from arthritis. He had not been certified by the clinic, but had been examined by Drs. Carey and Williams. At first, the defendant declined to prescribe for him. Later he examined him and prescribed drugs and advised hospitalization. In all these cases the treatment was interrupted by the arrest of the addicts and later by the discontinuance of the treatment by the defendant.

The evidence shows clearly, not the case of a physician who, looking for gain—in violation of that high ethical standard

which should govern physicians—seeks to capitalize his knowledge by preying upon unfortunate addicts. I have nothing but contempt for that kind of physician. We here have a situation, as I see it, of a city medical department establishing a narcotic clinic and finding that it resulted in evil; of the law enforcement authorities objecting to it, and closing it, and then this physician being asked by the city medical authorities to take over the work. It is undisputed that Dr. Parrish asked the defendant to take over the work of the clinic and that he was paid by the city. It seems to me that, under those circumstances, to find that a physician who did so, violated the law—merely because, from the viewpoint of the law enforcement authorities, he was not so careful as he might have been with re-examinations, and in issuing drugs to persons who in their opinion should have been hospitalized—would do violence to the very spirit of the law; and to the very spirit of fairness which we must always read into the interpretation of any penal statute of the United States, as expressing that desire which is so prominent in the American people, the desire for fair play. It would mean as though we asked a person to do a thing and then told him, "I am sorry, but you have committed an offense." That does not mean, of course, that a person might not be guilty of an offense under the act although he followed the advice of the city medical authorities in such matters. I think he could be. It is not the law that a medical officer can give absolution for criminal offenses, any more than it is the law that the enforcement officers, by placing their own interpretation on the law, can create an offense which does not exist. But a physician is not punishable under this law, unless, under all the evidence in the case, he is shown to be guilty of bad faith, and to have failed to follow accepted medical practices.

Can we say that a physician, who, at the behest of state or city authorities, took over the treatment of narcotic addicts, who supplemented the clinical record which he knew existed by his own examination, and administered drugs for a period of a few weeks, while he was treating each of these persons, is guilty of bad faith and violates proper medical practices? The answer must be in the negative. Any other interpretation would make us dogmatic arbiters of the medical profession and would do harm to the anti-narcotic cause.

The conclusion I have expressed is made more imperative by the fact that we have expert medical testimony to the effect that the treatment which the defendant administered was proper under the circumstances and conformed, as one physician, Dr. Ross Moore, said, even to the high professional ideal of the Hypocratic oath. This oath makes it the duty of a physician to relieve suffering and to use his own judgment in so doing. He should not be punished when he lives up to it.

This applies to the three "clinic" cases. As to the "nonclinic" case—the case of Tint—I believe the evidence shows that the treatment was warranted. He went to the defendant because he understood from those who had attended the city clinic that it had been taken over by him. But whether we tie him to the clinic or not, the fact remains that he was and had been an addict over a long period of time; that he had been given narcotic prescriptions by others; that he was first refused by the defendant and that hospitalization was advised. The fact that Tint is cured now, after long incarceration in a penitentiary especially equipped to deal with narcotism, should not be considered in determining whether the treatment was proper at the time. As to Mayers, Jensen, and Avery, the evidence shows that the drug was withdrawn from them while they were in jail, by a physician who had no previous experience along these lines. But, except when incarcerated, they have since returned to the habit. Ultimately, however, even if the result was not what was expected, the question to determine is not whether *the judgment used was good* or bad, but whether the defendant *believed,* in all these cases, that the treatment he administered was proper by ordinary medical standards. The evidence supports the conclusion that he did so believe. More, the evidence—exclusive of the defendant's own defense of his actions—warrants the conclusion that the practice was proper.

For the reasons indicated I find the defendant not guilty of any of the offenses with which he is charged in the four indictments. Exception to the government.